STATE *v.* LEEPER.

STATE v. JOHN F. LEEPER et als., COMMISSIONERS OF
GASTON COUNTY.

(Filed 20 May, 1908).

1. Indictment — County Commissioners — Erection and Repair of
Courthouse—Cognate Duties—Motion to Quash Not Allowed.
An indictment against the county commissioners, charging them
with unlawful and willful omission, neglect and refusal "to erect
and repair the necessary courthouse * * * and to raise by
taxation the moneys therefor," particularizing the necessity, is
sufficient, and may not be quashed on the ground that it charged
different duties for which separate counts in the indictment
should have been presented. Revisal, secs. 1318, 3590, 3592.

2. Same—Remedy—Evidence—Election.
When it is plain that county commissioners, under an indict-
ment in conformity with the wording of Revisal, sec. 3592, are
charged with neglect of duty in failing to provide a sufficient
courthouse, the offense is sufficiently set out (Revisal, sec. 3254) ;
and a motion to quash may not be granted for that the failure
"to erect" and "to repair" were charged in the same bill, the
remedy being to require the Solicitor to elect at the close of the
evidence.

3. Same—Corrupt Intent—Language of Statute—Sufficiency.
It is not necessary to allege corrupt intent in a bill of indict-
ment against county commissioners for neglect of duty in pro-
viding a necessary courthouse, and it is sufficient if the words of
the statute are followed.

4. Same—Bill of Particulars.
If a defendant desires further particulars, under an indictment
for neglect of duty as a public officer, he should ask for a bill of
particulars. Revisal, sec. 3244.

5. Same — County Commissioners — Sufficient Courthouse — Man-
damus Will Not Lie.
A *mandamus* will not lie against county·commissioners to com-
pel. them to provide a sufficient courthouse.

CONNOR, J., dissenting *arguendo;* WALKER, J., concurs in the dis-
senting opinion.

CRIMINAL ACTION, heard by *Moore, J.,* upon a motion to
quash the bill of indictment, at March Term, 1908, of the
Superior Court of MECKLENBURG County, the motion having

been continued thereto, by consent, from Spring Term, 1908, of the Superior Court of Gaston County.

The defendants, who are County Commissioners of Gaston County, were indicted in the following bill:

"The jurors for the State, upon their oaths, present: That John F. Leeper, J. W. Kendrick, O. G. Falls, A. R. Anders, J. C. Puett and R. K. Davenport, Commissioners of Gaston County, N. C., were duly elected Commissioners of Gaston County at the general election held in the year 1906 for members of the General Assembly and other officers required by law to be elected at that time in Gaston County, N. C.; that they were elected for two years from the first Monday of December, 1906, and took the oath required by law for county commissioners, and entered upon the discharge of their duties as Commissioners of Gaston County, N. C., and now are acting and were at the time hereinafter mentioned acting as the Board of County Commissioners of Gaston County, N. C.; that, under the laws of North Carolina (Revisal of 1905, Vol. I, ch. 23, sec. 1318, subsec. 26), it is made the duty of the Board of Commissioners of Gaston County (naming them, as above) 'to erect and repair the necessary county buildings and to raise by taxation the moneys therefor'; that the county courthouse is a necessary county building for Gaston County, N. C.; that the present county courthouse for Gaston County, N. C., was built about sixty years ago, when Gaston County had a population of about 7,228; that Gaston County now has a population of about 30,000, or more; that the present courthouse is not large enough to hold the records of Gaston County, N. C.; that it is not large enough to accommodate the public officers of Gaston, who are required to keep their offices in said building; that it is not large enough for the suitors, jurors and witnesses who attend the courts of Gaston County, as by law they are required to do; that it is a small, incommodious building, inadequate and unsuitable to the present needs of the county of Gaston, N. C., is not in good repair, and is in

no sense a courthouse or county building necessary to the present needs of the public; that John F. Leeper and the others named above, commissioners as aforesaid, on the first day of November, 1907, unlawfully and willfully did omit, neglect and refuse to discharge the duty of their office, in that they unlawfully and willfully omitted, neglected and refused 'to erect and repair the necessary courthouse for Gaston County, N. C., and to raise by taxation the moneys therefor,' contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

"HERIOT CLARKSON,<br>
*"Solicitor."*

On motion of the defendants, the indictment was quashed. Appeal by the State.

*Assistant Attorney-General* for the State.

*Burwell & Cansler, A. G. Mangum* and *Osborne, Lucas & Cocke* for defendant.

CLARK, C. J.   This is an indictment against the county commissioners for neglect of duty.   Revisal, sec. 3592, provides that, if any officer "shall willfully omit, neglect or refuse to discharge any of the duties of his office, for default whereof it is not elsewhere provided that he shall be indicted, he shall be guilty of a misdemeanor."   And Revisal, sec. 3590, provides: "If any county commissioner shall neglect to perform any duty required of him by law as a member of the board, he shall be guilty of a misdemeanor," and also liable to a penalty.   Revisal, sec. 1318, under the heading "Powers and Duties" (of county commissioners), places under subsection 26 thereof the words "to erect and repair the necessary county buildings, and to raise, by taxation, the moneys therefor."

This indictment alleges that the courthouse of Gaston County is insufficient, specifying the particulars wherein;

146—42

also, that it is not in good repair, and that the defendants "unlawfully and willfully did omit, neglect and refuse to discharge the duty of their office, in that they unlawfully and willfully omitted, neglected and refused 'to erect and repair the necessary courthouse for Gaston County, N. C., and to raise by taxation the moneys therefor.'" The indictment followed the words of the statute (Revisal, sec. 3592), and should not have been quashed. Revisal, sec. 3254; *State v. Harrison,* 145 N. C., 417.

The statute made it, among other duties, the duty of the county commissioners to provide a sufficient courthouse and keep it in repair. It is their duty both to erect and keep in repair. They are cognate duties, and failure as to them can be charged in the same bill. The offense is "neglect of duty." The specifications are "failure to erect" and "failure to keep in repair." If either particular is proven, the offense is proven. It is like an allegation of an assault with a pistol and with a brickbat; proof of either sustains the charge; or like a charge of larceny of corn in the ear and of shelled corn, or of different articles of any kind, or other offenses alleged to have been committed in more than one way. The offense charged being "neglect of duty" in not erecting and in not repairing, there is no duplicity in the bill in alleging both particulars. Indeed, the Solicitor acted wisely in following the statute. If he had alleged neglect of duty in "not erecting" a courthouse, the defendants could have set up that they should have "repaired"; and, if he had charged neglect of duty in "failing to repair" the courthouse, the defense could have set up that they should have "erected" a courthouse.

To prevent this "hide and seek"—this travesty in investigating the charge of neglect of duty as to the courthouse—the Solicitor charged the neglect of duty, in the words of the statute, both in failing to erect and to repair. If the State can prove that either was the duty of defendants, under the cir-

cumstances, and that they have failed to discharge such duty, it is entitled to a verdict.    If it shall make a difference in imposing sentence (if there is a conviction), the Judge can ask the jury, or the defense can have the jury polled, as to whether they find the neglect of duty as to the courthouse was in failing to "erect" or to "repair," just as, in cases above put, he can ask the jury whether they find the assault was made with a pistol, or with a brickbat, or without weapon; or, when larceny of several articles is charged, as to which the jury find the theft proven.

Revisal, secs. 3254 and 3255, were passed to forbid refinements and technicalities which, without being any aid to the innocent, brought the administration of justice into disrepute. This purpose of the lawmaking department has been approved in strong and striking terms by *Ruffin, C. J.,* in *State v. Moses,* 13 N. C., 464, and by *Ashe, J.,* in *State v. Parker,* 81 N. C., 531, and in yet other cases by other Judges, from some of whom extracts are given with approval in *State v. Barnes,* 122 N. C., 1035, and many other cases, and they need not be again quoted.    The recitals and charge in this bill are so explicit that the defendants could not pretend, and did not, that they did not know that they were charged with neglect of duty in failing to provide a sufficient courthouse for the county.    Hence it was sufficiently charged.    Revisal, sec. 3254.

Whether such "neglect of duty" (if shown at all) was in failing to repair or in failing to erect, was a matter to be shown in the proof and to be passed on by the jury, just as when different modes of assaults and battery, or larceny of two or more articles, are charged.

If, however, failure "to erect" were one offense, and failure "to repair" were another, being cognate offenses, the remedy was not to quash, but to require the Solicitor to elect at the close of the evidence.    *State v. Williams,* 117 N. C., 753;

*State v. Allen,* 107 N. C., 805; *State v. Parrish,* 104 N. C.,
679; *State v. Morrison,* 85 N. C., 561; *State v. Eason,* 70
N. C., 88.

In *State v. Moses,* 13 N. C., 464, *Ruffin, C. J.,* speaking of
the act of 1811 (now Revisal, sec. 3254), says, with his usual
vigor and robust common sense: "This law was certainly de-
signed to uphold the execution of public justice by freeing the
courts from those fetters of *form, technicality* and *refinement*
which do not concern the substance of the charge and the proof
to support it. Many sages of the law had before called nice
objections of this sort a disease of the law and a reproach to
the bench, and lamented that they were bound down to strict
and precise precedents. * * * We think the Legislature
meant to disallow the whole of them, and only require the
*substance*—that is, a direct averment of those facts and cir-
cumstances which constitute the crime to be set forth." In
*State v. Smith,* 63 N. C., 234, the Court says: "The act of
1811 has the almost universal approval of the bench and bar.
It needs no higher endorsement than that of the late *Chief
Justice Ruffin,* in *State v. Moses* (cited *supra*). * * *
The act has received a very liberal construction, and its effi-
cacy has reached and healed numerous defects in the substance
as well as the form of indictments. * * * It is evident
that the courts have looked with no favor on technical objec-
tions, and the Legislature has been moving in the same direc-
tion. The current is all one way, sweeping off by degrees
'formalities and refinements,' until, indeed, a plain, intelligi-
ble and explicit charge is all that is now required." The
above have often been cited and approved by this Court, and
in other States which have similar statutes.

The defendants are explicitly charged with neglect of duty,
and they well understood that the particulars were that they
had not provided the county with a suitable courthouse, in that
they had neither repaired the old one nor built a new one.
They would have a complete defense by showing that they

had done either, or if the State failed to show that a better courthouse was necessary.    The object of the indictment is to give information of the charge.    The defendants do not deny that they have this information, which is the sole object of the indictment, but they earnestly contend that the preservation of our liberties requires that it should have been conveyed in two separate counts in the indictment instead of in one.    The burden of proof is on the State to prove its charge against the defendants.    Instead of meeting the evidence, their attitude recalls the language of Fox, in the English Parliament: "You may pull down the pillars of the temple, and nothing stirs; but touch a single cobweb in Westminster Hall, and the angry spider rushes forth."    The defendants object to having witnesses prove that they have neglected their public duty to furnish a proper courthouse, in that they have neither repaired the present one nor built a new one (though they fully understand the charge), because the charge is not made in two counts.    If made in two counts, it would be equally as sound logic to move to quash, because they were contradictory.

In indictments for neglect of duty by a public officer, corrupt intent need not be shown.    *State v. Hatch,* 116 N. C., 1003, which has been often cited since with approval.    It cannot be necessary to charge what need not be proven.    It is sufficient to follow the words of the statute.    *State v. George,* 93 N. C., 570; *Brown, J.,* in *State v. Harrison,* 145 N. C., 417.    The particulars are fully averred, but, if the defendants had desired further information, the statute provides that they could have a bill of particulars.    Revisal, sec. 3244; *State v. Pickett,* 118 N. C., 1233.    If corrupt intent were charged and proven, the judgment would include removal from office as part of the punishment.    Revisal, sec. 3592.

For such neglect of duty a *mandamus* does not lie.    *Ward v. Commissioners, ante,* 534, in which it is said: "The duty of providing a sufficient and proper courthouse is to be dis-

charged by the county commissioners, subject to indictment if there be a *willful failure.*" The judgment quashing the indictment is

Reversed.

CONNOR, J., dissenting: I make no apology, although I may be regarded as unduly sensitive about so trivial a matter as the form of an indictment, for expressing my dissent, with all possible respect, but with equally strong convictions, from the conclusion reached by the majority of the Court. It is true that the offense charged against these defendants is not a felony, but, under our statutes and the decisions of this Court, upon conviction, they may be fined for an amount, the limit to which has not yet been fixed by the General Assembly or this Court, and imprisoned, with all of its incidents, for at least two years; how much longer neither the Legislature nor this Court has yet said. I cannot bring my mind to the conclusion that a criminal prosecution, which may bring upon the citizen destruction of his estate and the incarceration of his person, is a trivial matter, or not deserving the most anxious consideration, when he appeals to the courts of his State to be accorded the protection guaranteed by the "law of the land." It is no sufficient answer to say that he will probably not be so punished. It is his inalienable right to demand that he be not put in peril of such punishment, otherwise than according to the law of the land. An indictment against a citizen is no trivial matter. The charge of unlawfully and willfully violating his official oath is a serious matter to a man who values his fair name and reputation, serving his county largely from a sense of duty. While this is true in respect to every citizen and in respect to every charge of violating the criminal law, it is peculiarly so when men who, by the citizens of their counties, have been chosen and called to discharge the most difficult, delicate and often thankless duties, without more than a nominal compensation, are charged with violation of duty. They have taken an oath to discharge these

duties. They must, in their faithful discharge, incur much criticism and give offense to many who differ from them and their judgment in the exercise of the discretion necessarily vested in them. They are to jealously guard the revenues of their county, secure an economical administration of its affairs, and at the same time provide for the numerous demands upon its resources, without increasing the burden of taxation. If they willfully fail and refuse to discharge these duties, it is conceded that they are indictable. Before they are called to answer a charge of neglect of duty, and thereby a violation of their official oaths, they are entitled, by the principles of the common law, by the Constitution of the State and the decisions of this Court, to be informed of the respect in which such failure by them is alleged. This is not a matter of *form,* but of *substance.* If but an empty form, to be explained away by judicial construction or removed by legislative enactment, why did the fathers, fresh from their struggle against the intolerable tyranny of "writs of assistance" and "general warrants," so carefully and so wisely place in the seventh article of the Declaration of Rights, at Halifax, in 1776, amid the struggle for independence, these words, "That in all criminal prosecutions every man has the right to be informed of the accusation against him"? This guaranty of the right of the citizen has at all times been in our Constitution (Art. I, sec. 11). So jealous were these liberty-loving men of this safeguard of liberty that they refused to ratify the Federal Constitution until, by the Sixth Amendment, it was made a part of that instrument. Is it worth while to occasionally recur to these first "fundamental principles"? Are they not the beacon lights by which the judicial mariner shall avoid steering the ship into dangerous and perilous waters or permitting it to drift backwards into the conditions from which the fathers rescued it—to the days of the star chamber, when the indictment was drawn in a foreign tongue, and when the defendant was not permitted to see it before pleading, and, by

pleading, without having it read to him, waived all defects? We ourselves are not so far removed from days when passion controlled the makers of statutes having for their purpose our destruction that we may safely dispense with these safeguards, which were then our only shield and protection. Mr. Bishop, discussing the identical question before us, gives an interesting account of impeachment of Sacheverell (15 How. St. Tr.) and the trial of Rosedale (10 How. St. Tr.), and speaks of them as "admonishing us to beware how we take down the barriers which the common law erected during the struggle of liberty with despotism between the accusation and sentence. As in peace we should prepare for war, so, while liberty is in repose, we should make ready for the days of her conflict." He further says: "Some rules have grown up, particularly of pleading and as respects the indictment, too subtle to accord with the more enlightened judgment of the present day. Yet they are less in number and absurdity than is commonly supposed. Such of them as are without just reason are, in many of our courts, discarded judicially, and in most States they are largely legislated away, so that now little remains to condemn beyond a too close adherence to old technical words and forms of expression. Indeed, the present tendency is toward too loose a practice and allegations too indefinite. For, although the unthinking multitude, crying to-day for this reform and to-morrow for that, pursuing with hot blood one class of offenders to-day, another to-morrow, would almost remove the obstruction of a trial between the offense and the punishment, the wise see that what may render slow the steps of real justice is the protection of innocence in its hour of peril and anguish."

Blackstone wisely observes that "Delays and little inconveniences, in the forms of justice, are the price that all free nations must pay for their liberties in more substantial matters." A wise Judge says: "The safety of the community consists in a steadfast adherence to rule and principle, espe-

STATE *v.* LEEPER.

cially in criminal cases, even if at times a guilty individual
should escape thereby." *State v. Jones,* 6 Halst., 289.    That
the constitutional guaranty to the citizen that, when charged
with crime, he is entitled to be informed of the accusation
against him, was, in our early history, jealously guarded, is
shown by many decided cases.    In *State v. Justices of Lenoir,*
11 N. C., 194, *Taylor, C. J.,* says: "There are some rules
relative to indictments which it is indispensable to observe,
notwithstanding the relaxation in point of form introduced
by the act of 1811.    The indictment must still contain a
description of the crime and a statement of the facts by
which it is formed, so as to identify the accusation; other-
wise, the grand jury might find a bill for one offense and
the defendant be put on trial in chief for another.    The
defendant ought also to know what crime he is called upon
to answer, and the juries should appear to be warranted
in their conclusion of 'guilty,' or 'not guilty,' upon the prem-
ises to be delivered to them.    The courts should also be
enabled to see on the record *such a specific crime* that they
may apply the punishment which the law prescribes, and
the defendant should be protected by the conviction, or acquit-
tal, from any future prosecution.    *These* are elementary rules,
which must be substantially observed."    *Henderson, J.,* in
the same case, says: "But the indictment must be conform-
able to the fact; *it must charge which of these duties was
omitted."*    In *State v. Commissioners,* 15 N. C., 345 (p.
351), *Gaston, J.,* citing *State v. Justices, supra,* says: "We
feel ourselves bound by it as authority, and the more strongly
as the principles which it upholds tend greatly to the certainty
of criminal prosecutions, *and are, therefore, important safe-
guards of civil liberty."*    These cases are cited with approval
by *Smith, C. J.* (quoting the language), in *State v. Fishblate,*
83 N. C., 654, and *Davis, J.,* in *State v. Commissioners,* 97
N. C., 388.    They have been, until probably in some recent
cases, adhered to as "sound law."    I think that they are not

only "sound law," but contrölling authorities, no less because
of the satisfactory reasons upon which they are rested than
because they are the result of the mature consideration of our
wisest and most learned Judges.    When we look beyond our
own State we find the same wholesome doctrine announced
and adhered to.    In *Murphy v. State,* 24 Miss., 590, *Yerger,
J.,* says: "The constitutional provision that every man
charged with crime has a right 'to demand the nature and
cause of the accusation against him' was intended to secure
to the citizen such a specific designation of the. offense laid
to his charge as would enable him to make every preparation
for his trial necessary to his full and complete defense."    The
learned Justice proceeds to state the reasons for his opinion
in almost the exact language of *Taylor, C. J., supra,* conclud-
ing: "An instrument which does not contain this degree of
certainty does not communicate to the accused 'the nature and
cause of the accusation' against him in the manner contem-
plated by the Bill of Rights.    Nor has the Legislature the
power to dispense with such degree of certainty in indict-
ments."

In *Bynum v. State,* 45 Ala., 86, *Peck, C. J.,* says: "When
a statute creates a new offense, unknown to the common law,
and describes the constituents necessary to constitute the of-
fense, an indictment under the statute must conform to the
description thus given."    *Slofer v. Slate,* 3 W. Va., 689.
In *State v. Smith,* 20 N. H., 399, *Gilchrist, J.,* said: "The
Bill of Rights was intended to protect the citizen against the
consequences of being held to answer to accusations not dis-
tinctly and seasonably made known to him, and requires that
he shall not be held to answer any offense until the same is
fully and plainly, substantially and formally described to
him.    *    *    *    We therefore think that the varied respects
in which the proceeding of these defendants (selectmen of
the town of Exeter) is represented in the indictment are such
as to render it difficult to determine what particular offense

they are legally charged with, and that, therefore, that paper
fails to describe to them any offense so plainly and fully as is
demanded by the Bill of Rights." In *Commonwealth v.
McGoven,* 92 Mass., 163, *Gray, J.,* said: "The Declaration
of Rights requires that no subject (citizen) shall be held to
answer for any crime or offense until the same is *fully and
plainly, substantially and formally* described to him." In
*McLaughlin v. State,* 44 Ind., 338, *Downey, C. J.,* discussing
the principle involved in this case, says: "How is he (the de-
fendant) to prepare for his defense against such a charge?
Or, if he shall be indicted a second time, how can it be made
to appear that he has already been arraigned upon the same
charge? There is no country, we presume, where the princi-
ples of the common law prevail and the liberty of the citizen
is respected, where the State is not required, in bringing an
alleged criminal into court to answer for a crime, to prefer
against him, in the form of an affidavit, information or indict-
ment, a specific accusation of the crime charged. It is ac-
cordingly provided in the Constitution of the State (copying
the provision similar to section 11, Article I of our Constitu-
tion). The constitutional guaranties, which we have just
quoted, are of the utmost importance to a person accused of
crime, and a disregard of them, or any of them, even in a
prosecution designed to suppress a traffic so full of evil as that
of retailing intoxicating liquors, cannot be tolerated with any
regard to the proper and safe administration of the criminal
laws." Decisions might be multiplied to the same effect, if
necessary. But it is said the indictment follows the language
of the statute, and, therefore, no matter how obscure or duplex,
how vague and uncertain, it is sufficient. Conceding that
such is the general rule, it is equally well settled that the
exception to it is, that if the language of the statute is indefi-
nite, obscure or fails to sufficiently define or describe the
offense, the bill must, wherein the statute is defective, comply
with the principles of the common law. To deny this is to

give to the Legislature the power to nullify the Constitution. It is, of course, fully conceded that, in so far as the fundamental principle embodied in the Constitution is not violated, the Legislature or the courts may and should relieve the administration of the criminal law of the odium which has attached to it by retaining obsolete, useless, meaningless technicalities in indictments. I make no controversy in this respect. I concede the wisdom of the statutes of *jeofails and amendments;* also those removing the necessity for useless technical averments (Revisal, secs. 3254 and 3255), but they, I submit, have no bearing whatever upon the question presented in this bill. Section 3254 expressly protects a bill from a motion to quash, "if it express the charge in a *plain, intelligible and explicit* manner." This act was passed during the year 1811, and several of the decisions which I have cited were made in the light of its provisions. *Judge Taylor,* in the first case (1828), expressly refers to it. The argument for the sufficiency of the bill finds no support in either statute. This Court has uniformly recognized that there are exceptions to the general rule in regard to the sufficiency of indictments following the words of the statute. *State v. Stanton,* 23 N. C., 424. In *State v. Simpson,* 73 N. C., 269, it was held that, although the statute made the killing of stock in an enclosure, etc., a misdemeanor, it was necessary to charge that the act was done "unlawfully and willfully." The judgment was arrested after verdict. *State v. Parker,* 81 N. C., 548. In *State v. Whitaker,* 85 N. C., 567, judgment was arrested on an indictment for entering upon land after being forbidden, because the words "unlawfully and willfully" were omitted, although the statute did not so require. So in *State v. Allison,* 90 N. C., 733. The true rule is well stated by *Metcalf, J.,* in *Commonwealth v. Welsh,* 7 Gray (75 Mass.), 324: "A charge in an indictment may be made in the words of a statute, without a particular averment of facts and circumstances, when, by using these words, the

act in which an offense consists is fully, directly and expressly alleged, without any uncertainty or ambiguity." In *United States v. Simons,* 96 U. S., 360, *Harlan, J.,* after stating the general rule, as laid down by Bishop, says: "But to this general rule there is the qualification, fundamental in the law of criminal procedure, that the accused must be apprised *by the indictment* with reasonable certainty of the nature of the accusation against him, to the end that he may prepare his defense and plead the judgment as a bar to any subsequent prosecution for the same offense." In *United States v. Carl,* 105 U. S., 611, *Mr. Justice Gray* says: "In an indictment upon a statute it is not sufficient to set forth the offense in the words of the statute, unless those words *of themselves* fully, directly and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished. \* \* \* The omission is matter of substance and not a 'defect or imperfection in point of form,' within the meaning of the statute." (Similar to ours). In *Evans v. United States,* 153 U. S., 584, *Brown, J.,* refers to the rule, which at one time prevailed, that an indictment for a statutory misdemeanor is sufficient if the offense be charged in the words of the statute, and says that it must, under more recent decisions, be limited to cases where the words of the statute themselves comply with the principle announced in *Carl's case." Bottulor v. United States,* 156 U. S., 426. This is the settled and uniformly adhered to rule in the Federal Courts. In the light of these fundamental principles, I submit that the indictment against the defendants cannot be sustained, and was, therefore, properly quashed by his Honor.

Several grounds for the motion are set forth in the well-considered brief of defendants' counsel. I will confine myself to the one regarding duplicity and uncertainty. The State makes it the duty of county commissioners to "erect and repair the necessary county buildings, and raise by taxation

the moneys therefor." The indictment charges that the defendants, being county commissioners, did, on the day upon which the inquisition was taken, unlawfully and willfully neglect, omit and refuse *"to erect and repair"* the courthouse. Conceding, for the purpose of the argument, that such failure to erect is indictable, I submit that an indictment charging *generally* a failure to discharge a public duty cannot be sustained. The Solicitor did not think so, because he undertook to specify the duty which he charges the defendants with having neglected to discharge—*to erect and repair a courthouse.* That a general charge of neglect to discharge an official duty is not sufficient is established by every case which has come before this Court. In *State v. Justices, supra,* the bill was quashed. In *State v. Commissioners, supra, Gaston, J.,* says: "But there the indictment must set forth the criminal omission, so that the defendants may know and the court see *what duty* has been neglected. It must not allege neglect generally." The reason and necessity for this are manifest: Commissioners have imposed upon them numerous duties. Revisal, sec. 1318, contains thirty-two subsections, multiplied into hundreds of specific duties by conjunctive sentences. If, upon a sweeping charge of a general neglect of duty, they could be called upon to join issue with the State, they could easily be undone and utterly destroyed. The time, although required to be alleged, need not be proven as charged; hence, for their entire term of office of two years they could, under a general charge, be convicted of any omission or neglect of duty which someone might choose to prefer against them, without notice in the indictment. The statute directs that commissioners shall *"erect and repair."* Thus, two well-defined, distinct and, in every respect, different duties are imposed. They can neither be performed at the same time, on the same object, nor neglected at the same time. Words, when used in statutes, having no relation to science or art, but in general use, are to be interpreted and given the meaning

STATE *v.* LEEPER.

usually and generally given them. Thus: "Erect—to raise, as a building; to build; to construct, as to erect a house or fort; to set up; to put together the component parts, as of a machine." Webster's International Dictionary, 506. "Repair—restoration to a sound or good state after decay, waste, injury, as to repair a house." *Ib.*, 1219. Is it possible to conceive of two words more distinctly different in every respect? If I make a contract with a builder to erect a building, and sue him for not doing so, can he defend by saying that he repaired a building? Or, if, upon a contract to repair, can I insist that he shall erect a building? Instead of being "cognate duties," they are antipodal—antagonistic. I concede that, if in the first portion of their term the commissioners erect a courthouse, they may be liable for not repairing it, if necessary, during the term. It was evidently this thought in the legislative mind which is expressed in the statute. The two duties cannot, in any respect, be said to be so related that a sweeping charge of their violation at the same time, in respect to the same thing, may be sustained. It is undoubtedly true that two offenses may be charged in one count, as an assault upon A and B, or larceny of the property of A and B; and, as said by *Pearson, C. J.,* the indictment will not be had for duplicity *"if it was all one transaction."* (Italics his). *State v. Simons,* 70 N. C., 336. On an indictment for an assault with a deadly weapon, or with intent to kill, the defendant may be convicted of a simple assault, because but one wrong is charged. On an indictment for burglary the defendant may be convicted of simple larceny, because one includes the other. Many illustrative cases could be cited, but in all of them there is the same underlying reason. The defendant cannot be misled. To defend against the graver crime necessarily involves a defense against the lesser. Here we have four distinct violations of the same number of statutory duties: the failure to erect a courthouse, the failure to raise money by taxation for that purpose, the

failure to repair a courthouse, the failure to raise money by taxation for that purpose. To defend each of these alleged offenses, different defenses, different evidence, are necessary. It is difficult to conceive how a more confused and inextricable mass of matter may be involved in one charge. With all possible respect, I submit that it is the sovereign State of North Carolina, and not these defendants, which is playing "hide and seek" at the bar of the court. It is at her door, and not theirs, that the charge should be laid of making a "travesty in investigating the charge of a neglect of duty." It cannot be that the State, whose duty it is to protect her citizens in their rights, and prosecute them in her courts openly and fairly, may lay "traps" or "dig pitfalls" with a view of preventing them from being informed of the accusation and entrapping them into a conviction. Of course, I do not mean to suggest that the learned and honorable Solicitor who drew this bill *intended* any such result, or that my brethren would encourage or approve such purpose. I speak only of the logical result of permitting such a bill to be preferred. For the State, through her judicial proceedings, to permit it, is, I submit, to keep the promise to the ear and break it to the hope—to give a stone for bread, and draw the citizen into danger when he is entitled to safety—to confuse him in his day of trial, when he should be surrounded and protected by the guaranties of the "law of the land." In a civil action the complaint must "contain a plain and concise statement of the facts constituting a cause of action." Revisal, sec. 467. In a justice's court, of limited jurisdiction, the defendant is entitled to have the plaintiff state the facts constituting his cause of action "in a plain and direct manner." For failure to comply with these simple provisions the defendant may demur, and, until the law is complied with, he is not called to answer. Can there be any doubt that, if these defendants were being sued in a civil action, the complaint, if in the terms of this bill, would be open to demurrer? But it is said

"the recitals and charge in this bill are so explicit that the defendants could not pretend, and did not, that they did not know they were charged with failing to provide a sufficient courthouse for the county." I assume and concede that the charge is explicit to my learned brethren, but I must confess that, if the charge is "neglect of duty in failing to provide a sufficient courthouse for the county," I find an additional reason for quashing the bill—the statute imposes no such duty. I look in vain for any language in the statute capable of such construction. It is this very vague, indefinite conception of the law which disturbs me. It was this which *Taylor, C. J.,* in *State v. Justices, supra,* and *Gaston, C. J.,* in *State v. Commissioners, supra; Smith, C. J.,* in *State v. Fishblate, supra,* and *Davis, J.,* in *State v. Commissioners, supra,* all writing for unanimous Courts, assigned as fatal defects in the indictments in those cases. Again, I submit that, by their motion to quash, under the advice of learned counsel, these defendants not only do pretend, but in evident good faith assert, that they do not know "what they are charged with." I am, unfortunately, in the same state of ignorance. Whether they are charged with the failure to erect or to repair, to raise thousands of dollars by taxation, without the special permission of the Legislature, for the erection, or hundreds for repair, I could never so much as conjecture from any and every word in the indictment. Again, it is said the Judge can ask the jury as to whether they find the defendants guilty of failing to "erect" or "repair," or the defendants can have them polled. I submit that this exhibits a failure to apprehend either the reason for or the value of the constitutional guaranty to which I have referred. It is not for the purpose of having the jury explain why they convicted a defendant. It is of but little import to him, after being tried upon an indictment so vague, uncertain and duplex that he was unable to make his defense or to know the accusation against him, as a sheep

brought to the slaughter, to be told that in some way the jury had wended their way through the labyrinth and found some path leading to his conviction. Again, it is elementary that a defendant, after joining issue, is entitled to a general verdict, unless the jury will of their own motion find a special verdict, and that, upon such special verdict, the court will direct them to find a verdict of guilty, or not guilty, as may be, in its opinion, according to law. This is settled by numerous decisions of this Court. *State v. Moore,* 29 N. C., 228; *State v. Holt,* 90 N. C., 749; *State v. Neis,* 107 N. C., 820. Great abuses are recorded in criminal trials in the past by interference by the court with the verdict of the jury. It should be recorded as rendered, unless it is insensible, in which case they should be directed to retire and render a verdict of guilty or not guilty. That so dangerous a practice should be allowed, as suggested, is a strong argument against bills so uncertain as to require any other than a general verdict. This is not one of the cases in which the State may, by electing at the conclusion of the evidence, render certain that which was not so. If one be charged with selling liquor on a day named, and it be shown that he sold on several other days to the same or to different persons, the Solicitor should elect for which sale he would ask a conviction. It is said that the bill is like one charging an assault with a pistol, a brickbat, etc., where proof of either will sustain the charge. I concede the law to be as stated, but the illustration indicates the fact that the opinion is based upon a misconception. In the illustration given, the offense charged is the assault, the brickbat or pistol the means. Here the charge is failing to erect or repair; these are the imposed duties; the failure to perform them the offense. It is, as I have said, a mistake to say that the offense is a "neglect of duty"; it is the failure "to erect and repair." This is the exact ground upon which the demurrer to the bill in *State v. Justices, supra,* is based. That case is, to my mind, controlling authority in this, as it

was held to be in *State v. Commissioners, supra.* In that case *Gaston, J.,* said: "The *corpus delicti* is that the streets were permitted to be out of repair, and the indictment assumes that the defendants, as commissioners, were bound to prevent this public inconvenience." He further says: "But then the indictment must set forth the criminal omission, so that the defendant may know and the court may see what duty has been neglected. It must not allege generally, still less state merely the consequences of the neglect of duty, but specify the offense producing such consequences." That a general verdict upon this bill would not protect the defendant from a second prosecution is too obvious to admit of discussion. It is not deemed worthy of notice in the opinion of the Court. It is suggested that, if the defendants had desired further information, they could call for a bill of particulars. I am unable to see how a bill of particulars could remove the duplicity manifest in this indictment. Defective bills of indictment may not be cured by bills of particulars. *Stale v. Van Pett,* 136 N. C., 633. There are other particulars set forth in the brief which, I think, have merit. I doubt very much whether, under the authorities relied upon, any criminal offense is charged. I concede that, if the Solicitor had been so disposed, he could have joined in separate counts the several matters charged in the bill. This is allowable and the proper practice. The defendant is put upon notice, and the jury may, under the instruction of the court, render a verdict upon either count—but certainly not, in this case, on both— or, at-any time during the trial, the Solicitor may take a *nol. pros.* upon any count. It is far from my purpose to favor placing unreasonable restrictions around the State in the prosecution of crime. I am strongly impressed with the conviction that the safety of the citizens, the protection of the innocent by an adherence to constitutional provisions and settled rules of pleading and procedure, are not incompatible with the safety and welfare of the State. Loose pleading

brings about loose procedure and loose modes of thought and action, resulting in confusion, uncertainty, often the conviction of the innocent and escape of the guilty. I cannot better close this already too long opinion than by quoting the language of *Pearson, C. J.,* in a case wherein the same question is involved. He says: "It is safest to follow the beaten path. According to the established forms, this indictment would have contained two distinct counts. * * * This mode of allegation would have fit the proof," etc. *State v. Simons,* 70 N. C., 336.

I note the fact that for nearly a century men occupying positions similar to these defendants have demanded the same protection which they do, and in every instance this Court has sustained their contention. The Legislature, during this long period, has not changed the law in this respect. Why, then, is it deemed necessary to approve and encourage laxity, uncertainty and duplicity in indictments? Is it not, in the light of the history open before us, wise to "walk in the beaten path"?

I have expressed my views strongly, because I am impressed with what I think a dangerous tendency to take down the barriers which the common law and the framers of our Constitution have erected to guarantee to every one charged with crime that he shall be informed of the accusation against him. We live in a day when the people, to meet evils and conditions menacing their welfare, demand rigid laws, with severe pains and penalties, having but little patience with those "delays and little inconveniences" which, Blackstone says, are the price which we pay for rights in more important respects. While the law should "work itself pure" and gradually wear away the bonds by which its adjustment to conditions has sometimes been retarded, the courts should adhere to "first principles" and not conceive themselves wiser than the law. This is especially true in criminal pleadings and procedure. That we live in times of peace and safety is due, in large

measure, to the wisdom of our ancestors; that those who come after us may inherit and enjoy the same peace and safety depends in large measure upon the fidelity with which we preserve the inheritance they have left to us.